UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 3:94cr112 (JBA) |
| *v.* | December 8, 2020 |
| HECTOR LUIS RIOS | |

**ORDER GRANTING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

Defendant Hector Luis Rios's motion [Doc. # 2251], pursuant to § 603 of the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (2018), seeks release from custody because Defendant's "medical conditions, including severe obesity, severe and uncontrolled hypertension, asthma and related lung ailments, and arthritis, [] render him especially vulnerable to COVID-19," (Def.'s Mem. in Supp. of Emerg. Mot. for Compassionate Release [Doc. # 2251-1] at 1). The Government does not dispute Mr. Rios's medical eligibility but opposes the motion in light of his violent criminal history and risk to public safety if released. (Gov't's Mem. Opp. Compassionate Release [Doc. # 2258].) For the reasons that follow, Defendant's motion for compassionate release is GRANTED.

**I.   Background**

On September 29, 1995, Defendant Hector Luis Rios, a member of the Latin Kings gang whose offense conduct began in 1991, was convicted by a jury of Racketeering in Corrupt Organizations ("RICO"), in violation of 18 U.S.C. § 1962(c) (Count One), RICO Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count Two), Violent Crime in Aid of Racketeering (VICAR) (murder of Sidney Diaz), in violation of 18 U.S.C. § 1959(a)(1) (Count Three), and conspiracy to possess with intent to distribute narcotics, in violation of 21 U.S.C.

1

§§ 841(a)(1) & 846 (Count Twenty-Seven). (Judgment [Doc. # 2210-4] at 1.) On January 26, 1996, at age twenty-seven with six prior felony convictions, Defendant was sentenced to three concurrent terms of life imprisonment. (J. at 2.) He received a life sentence on the VICAR count for Sidney Diaz's murder, which, along with his drug conspiracy conviction, was a RICO predicate. (*See* Addendum to the Presentence Report (PSR) [Doc. # 2210] at 4.) The second and third life sentences were for his RICO and RICO conspiracy convictions respectively. (*Id.*) His convictions were affirmed by the Second Circuit on May 4, 1999. *United States v. Diaz*, 176 F.3d 52, 72 (2d Cir. 1999). Defendant's motion to vacate, set aside, or correct sentence [Doc. # 1721], pursuant to 28 U.S.C. § 2255, was denied on May 17, 2002 [Doc. # 1797].[1]

Defendant has served 317 months, or twenty-six years, and seeks release from Victorville USP.[2] Find an Inmate, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed Dec. 8, 2020). As of December 8, 2020, eleven Victorville USP inmates and fifteen staff members were currently positive for COVID-19, with 144 inmates and twenty-one staff members having recovered. COVID-19, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last accessed Dec. 8, 2020). There have been no COVID deaths to date associated with this facility. (*Id.*)

The Court assumes the parties' familiarity with the ongoing COVID-19 pandemic and its spread from person to person, especially between those who are in close contact with one another. Centers for Disease Control and Prevention, *How COVID-19 Spreads*,

---

[1] On May 27, 2020, Mr. Rios moved for release under § 404 of the First Step Act [Doc. # 2205]. (Def.'s Mot. to Reduce Sentence, First Step Act [Doc. # 2205] (requesting a sentence reduction claiming his initial sentence relied on the disparately harsh guideline sentences required for distribution of crack that have since been reduced by the Fair Sentencing Act of 2010 (P.L. 111-220)).) Ruling on this motion is unnecessary in light of the disposition of the compassionate release motion.

[2] USP Victorville is currently, somewhat, overcapacity; it is designed to house 1,129 inmates, (Gov't Opp. at 14), and currently houses 1,197 inmates. Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/vip/ (last accessed Dec. 8, 2020).

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html (last updated Oct. 28, 2020). The Centers for Disease Control and Prevention (CDC) warn that certain conditions cause people of any age to be at increased risk of severe illness from COVID-19: cancer, chronic kidney disease, COPD (chronic obstructive pulmonary disease), heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies, immunocompromised state from solid organ transplant, obesity (body mass index [BMI] of 30 or higher), severe obesity ([BMI] greater than 40), pregnancy, sickle cell disease, smoking, and Type 2 diabetes mellitus. CENTERS FOR DISEASE CONTROL AND PREVENTION, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Dec. 8, 2020). The CDC also advises that the following conditions *may* increase the risk for severe illness from COVID-19: asthma (moderate-to-severe), cerebrovascular disease, cystic fibrosis, hypertension or high blood pressure, immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines, neurologic conditions (such as dementia), liver disease, overweight (BMI > 25, but < 30), pulmonary fibrosis (having damaged or scarred lung tissues), thalassemia, and Type 1 diabetes mellitus. *Id.* Moreover, "[a]mong adults, the risk for severe illness from COVID-19 increases with age, with older adults at highest risk." CENTERS FOR DISEASE CONTROL AND PREVENTION, *Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last updated Dec. 7, 2020).

Defendant submitted his request for release under § 603, because of the risk posed to him by the coronavirus pandemic, to the USP Victorville Warden on July 1, 2020. (Ex. G to Def.'s Mem. Emerg. Release [Doc. # 2251] at 33.)  On August 7, 2020, after thirty days passed with no response, Defendant filed this motion for release, ([Doc. # 2251]), and the

Government's opposition was filed on August 27, 2020, (Doc. # 2258]).  A virtual hearing was held on October 28, 2020 [Doc. # 2275].

## II.    Discussion

### a.  Compassionate Release and the COVID-19 Pandemic

Defendant moves for release under 18 U.S.C. § 3582(c)(1)(A), which provides, that

> the court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Although incarcerated persons previously could only seek compassionate release from the BOP, the First Step Act of 2018 permits prisoners to seek relief from the federal courts upon satisfaction of the exhaustion requirements. *See* 18 U.S.C. § 3582(c)(1)(A). On March 26, 2020, pursuant to the CARES Act, Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat 281 (March 27, 2020), the United States Attorney General urged the BOP to "prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic," stating that health concerns resulting from the pandemic likely constitute the "extraordinary and compelling reasons" required for compassionate release. Att'y Gen. William Barr, *Memorandum from the Attorney General to Director of Bureau Prisons* 1 (Mar. 26, 2020).

In granting authority to the federal district courts to decide motions pursuant to  28 U.S.C. § 3582(c)(1)(A), Congress intended to expand, expedite, and improve the process of

compassionate release.[3] *United States v. Brooker*, 976 F.3d 228, 235 (2d Cir. 2020). In holding Guideline section 1B1.13 applicable only to those release motions brought by the BOP, *id.* at 236 ("if a compassionate release motion is not brought by the BOP Director, Guideline § 1B1.13 does not, by its own terms, apply to [the motion for release]"), the Second Circuit described the discretion of federal district courts to consider a wide range of factors in assessing a motion for compassionate release, including a defendant's "age at the time of [the] crime, . . . the injustice of [a] lengthy sentence," and "the present coronavirus pandemic," *Id.* at 238. "[T]he only statutory limit on what a court may consider to be extraordinary and compelling is that rehabilitation alone shall not be considered an extraordinary and compelling reason." *Id.* at 237-38 (internal quotations omitted). Courts are therefore not limited to the specific "extraordinary and compelling reasons" enumerated in Application Note 1 of Guideline section 1B1.13, nor the directive by Attorney General Barr to consider primarily those acute health problems created by the pandemic, and may exercise their discretion in determining if the confluence of all the issues raised in defendants' motions for release warrants granting them. *See also United States v. McCoy*, No. 20-6821, 2020 WL 7050097, at *9 (4th Cir. Dec. 2, 2020) ("In short, we agree with the Second Circuit and the emerging consensus in the district courts[,] . . . district courts are empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.") (internal quotations omitted); *United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *9 (6th Cir. Nov. 20, 2020) ("[F]ollowing the Second Circuit's lead, [we hold that] where incarcerated persons file motions for compassionate release, federal judges may [] have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13.21."); *United States v. Gunn*, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20,

---

[3] The Second Circuit recently observed that "compassionate release is a misnomer" as the modifications to § 3582(c)(1)(A) under the First Step Act "in fact speak[] of sentence reductions." *Brooker*, 976 F.3d at 237.

2020) (agreeing with the Second Circuit that district courts have full discretion to define what constitutes "extraordinary and compelling" circumstances).

b.   *Rios's Motion for Release*

Mr. Rios argues that he should be released from BOP custody because his "health conditions, including obesity and poorly-controlled hypertension, have worsened while in BOP custody and render him especially vulnerable to COVID-19." (Def.'s Mem. Emerg. Release at 4.) At five feet, eight inches tall and weighing 244 pounds, Mr. Rios has a BMI of 37.2, well above the marker of a BMI of 30 which the CDC states places individuals at severe risk of complication from contracting COVID. (*Id.*) The Government does not dispute that Mr. Rios's medical conditions and needs in the context of the current pandemic likely meet the "extraordinary and compelling reasons" contemplated by the statute, but nevertheless argues that he is "ill-suited for relief under 18 U.S.C. § 3582(c)(1)(A), given the gravity of his violent criminal history and characteristics, resulting in his life sentences." (Gov't Opp. at 11.)

c.   *§ 3553 Sentencing Factors*

Although the Court finds Mr. Rios's health conditions to constitute extraordinary and compelling reasons for compassionate release, § 3582(c)(1)(A) requires the Court to also consider factors set forth in 18 U.S.C. § 3553(a), including

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, [] and to provide just punishment for the offense . . .
>> (C) to protect the public from further crimes of the defendant; [and] . . .
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a).

i.   *Nature and Circumstances of the Offense and Characteristics of the Defendant*

It cannot be disputed that Defendant's cold-blooded murder of Mr. Diaz is a most serious crime.  At the hearing on this motion, the Court heard the report of the extensive emotional harm Mr. Rios caused for the Diaz family, particularly for Mr. Diaz's mother who continues to suffer profoundly from the fact and manner of her son's death. The Government's summary of the victim family's position also included their remarkable decision to take no position on the outcome of Mr. Rios's efforts to be released, but only to ensure that he fully understood the gravity of his crimes and the colossal impact they have made on their family. That Mr. Rios planned this murder, acting not on impulse or on orders from others, but rather with the hard heart of a calculated killer, aggravates the seriousness of the offense.

During his years in prison, Mr. Rios appears to have matured significantly, particularly under the guidance Dr. Aarons, Chaplain Patterson, and Mr. Dean Howard. He has taken over fifty courses offered by the BOP, (BOP Records [Doc. # 2210-6] at 9-13; Ex. C to Def.'s Mem. in Supp. of Mot. to Reduce Sentence, First Step Act [Doc. # 2233-3]), the most challenging of which was a course on "soldering of electronic circuit boards . . . [that] took quite a bit of determination and effort to successfully complete," (Ex. D to Def.'s Mem. Supp. Reduce [Doc. # 2233-4] at 2). During these twenty-six years, he has accrued seven disciplinary infractions, none in the past four years and only one of which involved violence.[4] (BOP Records at 1-7.)   Mr. Rios has maintained positive relationships with his family members, particularly his siblings Jasmine Rios Bland and Orlando Rios, both of whom offer "the full support of [the] family" to help Mr. Rios "get on his feet."  (Ex. K to Def.'s Mem. Supp. Reduce [Doc. # 2233-11] at 3.) His sister writes that she "ha[s] seen his maturity in how he thinks and how he views conflicts" shift for the better, noting that "my brother is much calmer, softer even" now. (*Id.* at 2.)

---

[4] The violent incident occurred on March 5, 1999 when Mr. Rios was sanctioned for fighting with another inmate. (BOP Records at 6.) His disciplinary infractions have cost him fourteen "good time" credit days. (Addendum [Doc. # 2210] at 5.)

At the video hearing, Mr. Rios appeared to the Court as genuinely and deeply remorseful, admitting that in his youth he "was a menace to society" and "tak[ing] full responsibility for the murder of Sidney Diaz." (Ex. B to Def.'s Mem. Supp. Reduce [Doc. # 2233-2] at 2.) Mr. Rios acknowledges that he was "reckless" and needed "to pay for [his] crime," expressing deep sorrow for his actions, and lamenting that "[t]here are no words that people can accept for such callous actions." (*Id.*) He further acknowledges that his actions were "selfish of [him,] and it was selfish of those around [him]" because, even though "[they] were all brought up the same way and did the same things, [] it was never meant for [him] to destroy [Sidney's] dreams and who he was." (*Id.*) Mr. Rios maintains that he is now "a changed man," and the testimony of his family members corroborates that conclusion. (*Id.*)

   ii. *The need to reflect just punishment and protect the public from further crimes of the defendant*

Mr. Rios was sentenced to life to reflect the seriousness of his offenses. In his twenty-six years of imprisonment, he has matured from a rash young man pursuing a lawless, violent lifestyle, to a reflective, empathetic middle-aged adult. According to the *Overview of Federal Criminal Cases* published by the United States Sentencing Commission for the fiscal year of 2019, the average sentence imposed for murder is 255 months, about five years less than Mr. Rios has already served. U.S. SENTENCING COMM'N, OVERVIEW OF FEDERAL CRIMINAL CASES, FISCAL YEAR 2019, at 9 (2020). However, Mr. Rios was not sentenced for murder alone, but rather for a violent crime in aid of racketeering that included murder and extensive RICO drug trafficking. He has spent nearly half his life so far behind bars. This is significant punishment for his violent crime, depriving him of "the family life" that he "cherish[es] more than anything."

Factoring in Mr. Rios's rehabilitation and relatively negligible disciplinary record for twenty-six years, his continued risk to the public if released appears to be markedly reduced as recidivism declines with age, particularly when tempered by significant rehabilitation. According to a report by the U.S. Sentencing Commission, Mr. Rios, at over fifty years old, has

8

a recidivism rate of 9.5 percent. U.S. SENTENCING COMM'N, MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES 12 (2004). In his proposed release plan, Mr. Rios would live with his brother and his family in Euclid, Ohio, far from the Connecticut cities that he roamed as Regional Commander of the Latin Kings and from former associates who might tempt him back into "the life." (Ex. A to Def.'s Mem. Supp. Reduce [Doc. # 2233-1] at 5-6.) Given the length of his imprisonment, his personal rehabilitation, age, ill health, complete acceptance of responsibility, deeply felt remorse, and proposed release plan, the Court concludes that deterrence and public protection are no longer strong § 3553(a) factors weighing in favor of continued detention.

       *iii.*    *Sentencing Disparities*

           1.   *Sentencing Procedure*

Mr. Rios urges that inadequacies at his sentencing in 1996 should now be considered as additional grounds for his compassionate release. (Notice of Suppl. Authority in Supp. of Def.'s Emerg. Mot. [Doc. # 2273] at 4, 6.) The sentencing court found Mr. Rios's total offense level to be 43 under the U.S. Sentencing Guidelines which, under the then-binding Guidelines, required imposition of a sentence of life imprisonment, as Mr. Rios's counsel conceded. (Sentencing Tr. at 10 ("the law will not allow you to do anything other than sentence my [] client to life").)  The sentencing judge agreed, and found "based on the sentencing guidelines, the calculations and the verdict of the jury, the court has no discretion here and the sentence of the court is that the defendant be committed to the custody of the Bureau of Prisons for a term of life." (*Id.* at 11.) No mitigating factors were considered for any of the life sentences because Defendant refused to be interviewed for the PSR, so no social history was done. At sentencing, he declined to speak after consultation with his counsel.[5]

---

[5] The sentencing transcript does not reflect any colloquy on the PSR's Part D: Sentencing Options referencing "Statutory Provisions: The maximum term of imprisonment is . . . mandatory life on Count 3 (18 USC 1959(a)(1)." (PSR ¶ 60.)

In the subsequent sentencing hearing of co-defendant Richard Morales, the Government acknowledged that the mandatory statutory sentence for VICAR murder under § 1959(a)(1), referenced in both Morales's and Rios's Presentence Reports, (PSR of Richard Morales [Doc. # 2182-4] ¶ 179),

> was amended [] effective September 13, 1994, which would have been at a time that was after the commission of the offense [] but before the time of the indictment. . . . [Therefore,] it's correct to say that you should apply the former version under due process and hold that there's not a mandatory statutory life sentence,

(Sentencing Transcript of Richard Morales [Doc. # 1469] at 35-36). After a full hearing, including presentation of defense objections to the PSR and departure grounds, the court imposed six concurrent life sentences for the three VICAR murders, RICO and RICO conspiracy convictions.[6] (Judgment of Richard Morales [Doc. # 1070] at 2.).

The Court views the differences in the nature of the two sentencing hearings to be of only minimal significance, if any, in the consideration of Defendant's motion for release.

### 2. Life Imprisonment

Despite Mr. Rios's commendable rehabilitation, the fact remains that he was sentenced to life as punishment for, among other things, conspiring to commit and committing murder of another human being.  This factor weighs heavily against Mr. Rios. Defendant points to case law in which district courts reduced life sentences to time served in light of COVID-19. Some of those defendants with life sentences who received such relief were deported immediately upon release, *see United States v. Ledezma-Rodriguez*, 2020 WL 3971517, at *8 (S.D. Iowa July 14, 2020); *U.S.A. v. Barron*, 2020 WL 4196194, at *1 (C.D. Cal. July 9, 2020), or were supported by the Government in their petition for release, *see United States v. Plunk*, 453 F. Supp. 3d 1308, 1310 (D. Alaska 2020); *United States v. Perez*, 2020 WL

---

[6] Mr. Rios challenged his conviction on appeal and his sentence in his *habeas* petition but had procedurally forfeited the claim because he failed to raise it in his direct appeal. (Order Denying Mot. to Vacate [Doc. # 1797] at 1.)

1180719, at *1 (D. Kan. Mar. 11, 2020), or were convicted for nonviolent offenses, *see United States v. Torres*, 2020 WL 2815003, at *8-*12 (S.D.N.Y June 1, 2020) (granting compassionate release for two brothers convicted of conspiracy to sell heroin in part because the original sentencing judge supported reduction of their sentences); *United States v. Kubinski*, 2020 WL 2475859, at *1 (E.D.N.C. May 13, 2020) (granting release despite the imposition of four life sentences because the defendant's crimes were for nonviolent drug distribution and conspiracy).  In contrast, here, Mr. Rios was convicted of murder, his release is opposed by the Government, and he will remain in the country upon release.

The Court notes that other defendants convicted of both capital and other violent crimes and sentenced to life have been released by district courts in light of the pandemic. *See United States v. Fisher,* 2020 WL 5992340 (S.D.N.Y. Oct. 9, 2020) (reducing a life sentence for involvement with a violent narcotics ring to time-served in light of defendant's admirable rehabilitation and the COVID-19 pandemic); *United States v. Tidwell*, No. CR 94-353, 2020 WL 4504448, at *11 (E.D. Pa. Aug. 5, 2020) (releasing a man serving a life sentence for, among other things, two counts of murder in furtherance of a continuing criminal enterprise); *United States v. Curtis*, 2020 WL 1935543, at *1 (D.D.C. April 22, 2020) (releasing defendant under § 3582(c)(1)(A) despite his six concurrent terms of life for operation of a sex-trafficking ring involving minors); *United States v. Williams*, 2020 WL 1751545, at *3 (N.D. Fla. Apr. 1, 2020)  (granting release and reducing a life sentence for conviction of armed robbery because defendant's health concerns were serious enough that "an outbreak of COVID-19 in [Defendant's] facility would likely have fatal consequences for him"). Thus, Mr. Rios's life sentence is a substantial, but not impossible, hurdle for him to overcome.

### 3.  Disparity with Co-Defendant

The Court is also mindful that compassionate release was denied to co-defendant Richard Morales, a former member of the Supreme Crown of the Latin Kings. *United States v.*

*Richard Morales*, 2020 WL 4926609, at *4 (D. Conn. Aug. 20, 2020). Mr. Morales is serving six concurrent life terms for three conspiracy-related murders and one attempted murder, "[e]ach [of which] was carried out in a particularly brutal manner" and for which "Morales, a then-senior member of the Latin Kings, was far more than a mere accessory to their execution." *Id.* at *3. Although, the court in *Morales* found that the "[defendant's] rehabilitation over the past 25 years is nothing short of admirable, . . . [in order to] reflect the seriousness of the crimes, to afford adequate deterrence, and to protect the public, [r]educing those [six life] sentences to a sentence of thirty years would not [] comport with the sentencing goals." *Id.* at *3.

There are notable distinctions between Mr. Morales and Mr. Rios. Mr. Morales was a significantly higher ranked Latin King, a member of the Supreme Crown, the three-person entity that controlled the entire Latin Kings operation in Connecticut, and an appointed member of the statewide Board of Directors of the Latin Kings. (Morales's PSR ¶¶ 8, 18) His conduct was reflected in an organizer-leader role enhancement described for his role in the VICAR murder of Victor Mojica and drug conspiracy, (*Id.* ¶¶ 108, 120), while Mr. Rios, as one of several Regional Commanders responsible for certain areas of the state, received only a manager-supervisor role enhancement for his participation in the drug conspiracy. (Rios's PSR ¶ 28.)

Further, Mr. Rios's sentence punishes him for one murder while Mr. Morales's sentence of six life terms punishes him for the murders of three individuals and the attempted murder of a fourth. While taking one person's life is morally reprehensible, killing three bespeaks a level of depravity that distinguishes Mr. Morales's crimes from those of Mr. Rios and warrants different consideration in the balancing of compassionate release factors. *See Morales*, 2020 WL 4926609 at *4 ("He took the lives of not just one individual, but three").

       *iv.*    *Reduction in Sentence*

After thorough consideration of the § 3553(a) factors, including deterrence and public safety objectives of sentencing as well as Defendant's health risks, the Court concludes that the interests of justice weigh in favor of granting Mr. Rios compassionate release. Given the gravity of the offense, the Court follows the Second Circuit's admonishment to "reduce but not eliminate a defendant's prison sentence," *Brooker*, 976 F.3d at 237, and thus reduces Defendant's sentence from three terms of life to thirty years.  With application of Defendant's good time credit days, the Court anticipates that this reduction will result in Mr. Rios's prompt release from prison and thus from the conditions which augment his exposure to the COVID-19 virus and put him at severe medical risk, particularly in light of the recent upward surge in COVID-19 infections. (Def.'s Mem. Emerg. Release at 4.)

## III.     Conclusion

For the foregoing reasons, Defendant's Emergency Motion to Reduce Sentence under the First Step Act for Compassionate Release [Doc. # 2251] is GRANTED and Defendant's sentence is hereby reduced to 360 months. He shall be released to the home of his brother Orlando Rios in Euclid, Ohio. He shall serve five years on supervised release on Counts 1-3, and three concurrent years on Count 27. He must comply with the standard and mandatory conditions of supervised release and shall be on total quarantine for the first fourteen days following his release and on home confinement for the first nine months of supervised release with location monitoring at Defendant's expense. Special conditions of supervised release are that he shall participate in a full-time job skills development program if he is not employed or in school full time. He shall participate in a mental health counseling program approved by the U.S. Probation Office for which he shall pay the cost as he is financially able. He shall also perform 250 hours of approved community service.

IT IS SO ORDERED.

13

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 8th day of December 2020.